No. 46,699

State of Kansas, *Appellee,* v. Garrett Jack Ogden, *Appellant.*

(502 P. 2d 654)

Opinion filed November 4, 1972.

*Albert Kirk,* of Wichita, argued the cause and was on the brief for the appellant.

*Wallace W. Underhill,* deputy county attorney, argued the cause, and *Vern Miller,* attorney general, *Keith Sanborn,* county attorney, and *Larry Kirby,* deputy county attorney, were on the brief for the appellee.

The opinion of the court was delivered by

SCHROEDER, J.: This is an appeal by the defendant, Garrett Jack Ogden, from a conviction of the crimes of burglary and larceny of the Quality Poultry Company in Sedgwick County, Kansas; burglary and larceny of Johnson Trucks Company in Sedgwick County, Kansas; and uttering and forgery. The appellant was acquitted by the jury on charges of burglary and larceny of the Dobson Roofing Company in Sedgwick County, Kansas, and possession of burglary tools.

Numerous trial errors are asserted for reversal on appeal.

Testimony given at the trial showed that the appellant, Gary Belden and Jerry Lee Owen were involved in a forged check cashing ring. Both Belden and Owen testified on behalf of the state.

On the 11th day of February, 1970, a search warrant was issued and the appellant's residence at 1350 South Gordon in Wichita, Sedgwick County, Kansas, was searched by the police. A typewriter, a check protector and an envelope with "J" letters and "J. A.

Johnson" written on it, and other items not considered evidence, were found as a result of the search.

Richard Dobson, a roofing contractor doing business under the name Dobson Roofing Company, testified that some time during the late evening of January 29, 1970, or the early morning of January 30, 1970, an entry was made into his building and a typewriter and check protector were missing upon his return to the building for work on January 30, 1970. (Dobson testified James Bell worked for him in November and December, 1969. Bell was apprehended at the scene of a burglary involving Quality Poultry Company at 2:00 o'clock a. m. February 5, 1970.)

Mr. J. R. Johnson testified that he was in the moving and trucking business and that he left his business, Johnson Trucks, around 9:30 p. m. on January 29th and arrived back at the building around 6:30 a. m. on January 30, 1970. Mr. Johnson testified that the back glass of the restroom had been broken out and a television set, fourteen (14) blank checks and numerous cancelled checks were missing. All of the checks had "Johnson Trucks" printed on them. Two of those checks were identified by Mr. Johnson as being state's Exhibit No. 9 and state's Exhibit No. 10. Mr. Johnson testified he did not sign these two checks and that he gave neither the appellant nor Jerry Owen permission to sign any checks whatsoever. These two checks purported to bear the signature of J. A. Johnson and were made payable to Jerry Owen.

The appellant, Garrett Jack Ogden, was the nephew of Mr. Johnson. Mr. Johnson's wife and the appellant's mother are sisters. On the afternoon before the burglary the appellant accompanied his mother to visit Mrs. Johnson at the Johnson Trucks place of business. The appellant was in the office and had looked around. He had previously worked for Mr. Johnson in the trucking business.

Jerry Lee Owen testified for the state that he had lost his identification after being at the appellant's residence on January 28, 1970. Mr. Owen stated that on the following day he had asked the appellant about this loss and the appellant told him the billfold had not been found. However, on January 30, 1970, the appellant came to Owen's home and asked him to cash some checks. The appellant informed him Gary Belden had been cashing the checks using Jerry Lee Owen's identification, but that Belden had been apprehended by the police. Owen testified the appellant then drove him to various places within the city where he had intended to pass checks

on the Johnson Trucking Company. Owen testified he was the individual who had cashed state's Exhibit No. 9 on January 30, 1970. He stated he had received 50% of the money for cashing a total of five checks.

Gary Belden testified the appellant had asked him on January 29, 1970, if he wished to make some money, and the appellant advised him that he would explain the following day how this would be done. Belden stated he saw checks at the appellant's home as well as a check protector and a typewriter. The checks had the name of Johnson Trucks and Jerry L. Owen upon them. He stated he used Jerry L. Owen's identification which was given to him by the appellant to pass the checks, and that the appellant told him the money would be split five ways. Belden was apprehended at a store attempting to pass one of the checks.

Numerous law enforcement officials and other persons testified making identification of persons and exhibits. The state's evidence adduced at the trial and presented in the record was overwhelming and amply supports the jury's finding of the appellant's guilt on each of the counts upon which he was convicted. In his brief the appellant abandons the point alleging that the verdict is contrary to the evidence.

The appellant contends his motion for a directed verdict should have been granted. He argues all the charges pertain to crimes committed by a principal, whereas, he asserts the evidence produced at trial only tended to incriminate him as an accessory. This argument has no merit. (See K. S. A. 21-105.)

K. S. A. 62-1016 provides: "Any person who counsels, aids or abets in the commission of any offense may be charged, tried and convicted in the same manner is if he were a principal." This statute was in effect at all times material herein and is the applicable law. In *State v. Irwin,* 133 Kan. 509, 511, 300 Pac. 1098, the court stated:

"The law of this state is established, both by statute and the decisions of this court, that one who counsels, aids or abets in the commission of any offense, may be charged, tried and convicted in the same manner as if he were principal."

The appellant contends the trial court erred in giving Instruction No. 12 to the jury. It reads:

"The possession of stolen property, recently after the theft, throws upon the possessor thereof the burden of explaining such possession. If the same is unexplained such possession may be sufficient of itself to warrant a conviction

of the crimes of forgery and larceny from a person. However, such possession, to warrant a conviction thereof, must have been so recent after the time of the commission of the forgery and larceny from a person as to render it morally certain that such possession could not have changed hands since the commission of such offenses.

"However, before this presumption can be applied you first must find beyond a reasonable doubt that the defendant did have possession of said property as outlined herein."

The appellant contends the instruction is erroneous because the possession was not shown to be recent and it was not shown that he had exclusive possession of the stolen property. In *State v. Sharp*, 174 Kan. 672, 675, 258 P. 2d 306, the court said:

". . . the words 'recent' and 'exclusive' are relative terms, and the contention for a literal application of their definitions cannot be sustained. . . ."

In the instant case the burglary was shown to have occurred on the night of January 29, or the early morning of January 30. Testimony established that the appellant was in possession of the stolen items on the 30th day of January.

In *State v. Wilson*, 198 Kan. 532, 426 P. 2d 288, the court held the passing of a stolen check four days after the burglary and larceny occurred was within the "shortly after" provision of the rule, and warranted the giving of an instruction on the unexplained possession of recently stolen property.

The appellant also contends recent possession of stolen property "is evidence only going to the theft of that property and not forgery." This argument would have some merit if it were not for the fact that we are concerned with stolen blank checks that also were forged.

In *State v. Brown*, 145 Kan. 247, 251, 65 P. 2d 333, the court said:

". . . Was it necessary to prove the manual execution of the false signature by the defendant? Or does the possession of the forged instrument without a reasonable explanation raise a presumption of guilt? We think it does, and that the instruction was proper under the evidence in this case."

The court in *State v. Earley*, 119 Kan. 446, 448, 239 Pac. 981, held in Syl. ¶ 3:

"Possession of a forged instrument by one who utters or seek to utter it, or otherwise to realize on it or profit by it, without a reasonable explanation of how the possessor acquired it, warrants an inference that the possessor himself committed the forgery or was a guilty accessory to its commission."

By Instruction No. 21 the jury was instructed precisely in accordance with the rule above stated in *Earley*.

It would have been better practice to limit Instruction No. 12 to the unexplained possession of recently stolen property, but when all of the instructions given are viewed as a whole, we cannot say the appellant was prejudiced by the giving of Instruction No. 12. It is apparent the trial court was merely attempting to combine two proper instructions.

The appellant next contends that the jury returned inconsistent verdicts in finding the defendant guilty of the burglary and larceny of the Quality Poultry Company, while it acquitted him on the companion charge of possession of burglary tools. The appellant asserts this should be grounds for a new trial.

The evidence disclosed the items upon which the state relied for a conviction regarding the possession of burglary tools were: two screw drivers, a claw hammer and a piece of chain. The screw drivers were found outside the Quality Poultry Company building near a walk-in freezer chute. Officers arrived while the burglary was in progress and one of the suspects was apprehended in the building. The appellant was identified when he was seen leaving the premises. Among the items found outside the building, which were dropped in haste by the burglars, were three books of blank business checks, the property of Quality Poultry Company. A blue 1961 Oldsmobile four door, identified as belonging to the appellant, was parked 68 paces to the east of the building. The motor of the Oldsmobile was still warm when the officers investigated. They found the claw hammer on front seat and the chain and some other items inside the Oldsmobile.

Apparently the jurors felt these commonly used hand tools were not burglary tools and acquitted the appellant on this charge, but they did find him guilty of the burglary and larceny of the Quality Poultry Company.

These two offenses are independent. One can commit a burglary without burglary tools, and one can be guilty of the possession of burglary tools without committing a burglary. Each constitutes a separate and distinct offense.

A similar situation was before the court in *State v. Murphy*, 145 Kan. 242, 65 P. 2d 342. There the jury found the appellant guilty of uttering and returned a verdict of acquittal on forgery under the particular facts. In the opinion the court said:

". . . By statute in this state, although both forgery of a check and uttering of a check are classified as forgery in the second degree, yet each constitutes a separate and distinct offense. (G. S. 1935, 21-608, 21-609.)

Assuming, under the facts in this particular case, the verdict was inconsistent, does that fact require a reversal of the conviction for uttering? Lawyers and courts have frequently observed conduct of juries which was completely devoid of logic. The stories of these varied experiences and observations, reduced to writing, would indeed provide most interesting reading. Supposing, however, in the instant case, the jury was derelict in its duty and should also have found appellant guilty of forgery, would that fact justify this court in following the example of the jury and thus clear appellant on all counts? This court has held otherwise in cases where two parts of a verdict were utterly irreconcilable. (*State v. Brizendine*, 114 Kan. 699, 200 Pac. 174; *State v. Brundige*, 114 Kan. 849, 200 Pac. 1039; *State v. Hund*, 115 Kan. 475, 222 Pac. 766; *State v. Stewart*, 120 Kan. 516, 243 Pac. 1057; *State v. Jackson*, 121 Kan. 711, 249 Pac. 688; *State v. Axley*, 121 Kan. 881, 250 Pac. 284.) The conviction cannot be reversed on the ground of inconsistency." (p. 243.)

During closing arguments the prosecutor attempted to imply to the jury that it was inconsistent for the appellant to defend on the ground of insanity as well as defending on the ground that he did not commit the alleged crimes. The appellant contends this constituted prejudicial misconduct sufficient to require a reversal of his convictions. While it may be conceded the prosecutor's comment was improper, on the facts in this case it did not constitute prejudicial error when considered with the court's admonition to the jury. The trial court admonished the jury to completely disregard the statement and ordered that it be stricken from the record. The court went on to inform the jury that a plea of insanity gives rise to no inference of guilt.

On the facts in this case the inconsistent nature of a plea of insanity, wherein the appellant seeks excuse for his conduct and asserts a defense on the ground that he did not commit the alleged crimes, was first raised by counsel for the appellant in his voir dire examination of the jurors. In addressing the jury he said:

". . . Now, would you have any feeling against the defendant who made consistent but different defenses? In other words, if Mr. Ogden's-defense —says not only, 'I did not commit these crimes,' but if he also says that 'according to law I couldn't be charged with any crimes anyway, because, according to the law, I'm insane,' would you have any feeling against a defendant who took a position like that?"

Under these circumstances we cannot say the appellant was prejudiced.

The appellant placed Dr. Luis Ibarra, M. D., a psychiatrist, on the witness stand to testify in his behalf. The doctor revealed the appellant suffered hallucinations. As a result of his examination and testing he said the appellant was suffering mainly from a personality

disorder, but at the time the testing was done he did not show any psychosis.

On cross-examination Dr. Ibarra testified:

"The defendant's main problem was that he was suffering from a personality disorder and a person like this has more tendency than the average person to get into conflict with society. It is possible that the hallucination was caused by the LSD. My observation was that when he was admitted the defendant was disorganized to a mild degree, he believed that the hallucinations were true. When Ogden was admitted to the hospital he was confined to the lock up section. A person suffering from a personality disorder cannot assess situations correctly."

He further testified on cross-examination a laboratory test was performed on a sample of the appellant's blood and it showed a blood level for LSD.

The appellant next contends the evidence obtained in the search and seizure of his house should not have been introduced because of a defective affidavit, and because premises were searched which were not authorized by the search warrant.

At the search made pursuant to the search warrant, the following items were seized: A Smith-Corona typewriter, a Paymaster check protector, an envelope on which there was writing, and some identification owned by Jerry Lee Owen. Photographs of these exhibits in the interior of the house were taken and introduced over objection. The appellant argues the application and affidavit to support the application were defective, relying upon *Aguilar v. Texas,* 378 U. S. 108, 12 L. Ed. 2d 723, 84 S. Ct. 1509.

The effect of the United States Supreme Court decisions is recognized in *State v. Hart,* 200 Kan. 153, 434 P. 2d 999, where the court said:

"We are mindful of what has been said in *Nathanson v. United States,* 290 U. S. 41, 78 L. Ed. 159, 54 S. Ct. 11; *Giordenello v. United States,* 357 U. S. 480, 2 L. Ed. 2d 1503, 78 S. Ct. 1245; and *Aguilar v. Texas,* 378 U. S. 108, 12 L. Ed. 2d 723, 84 S. Ct. 1509; and we recognize the precedent established by those cases. The import of those decisions, . . . is that before a search warrant may validly be issued, there must have been placed before the issuing magistrate sufficient facts to enable him to make an intelligent and independent determination that probable cause exists; . . . mere affirmations of belief or suspicion are not enough; . . . there must be sufficient affirmative allegations as to the affiant's personal knowledge or his knowledge concerning his informant, or as to the informant's personal knowledge of the things about which the informant spoke, to provide a rational basis upon which the magistrate can make a judicious determination of probable cause." (p. 162.)

The application for a search warrant properly described the place

to be searched as "a white frame residence located at 1350 S. Gordon, Wichita, Sedgwick County, Kansas," and listed the items of contraband, including "28 blank checks and copies printed 'Johnson Trucks' on Fourth National Bank of Wichita." The body of the affidavit reads:

"GEORGE LUX, of lawful age being first duly sworn on oath, states:

"Affiant states that he is a detective for the Wichita Police Department; that he knows from talking to J. R. Johnson that a burglary of Johnson Trucks took place on January 29, 1970, and the checks and television set listed in this application were stolen.

"Affiant further states that Gary K. Belden was arrested by Officer Morris after attempting to cash a forged check drawn on the account of Johnson Trucks at Food City on January 30, 1970, said check having been stolen from Johnson Trucks in the said burglary; that the said Gary K. Belden told him the typewriter, checks and a check protector listed in this application are located at the residence of Garrett Jack Ogden, 1350 S. Gordon, Wichita, Kansas.

"Further affiant saith not."

He argues there was no showing as to the basis for Belden's purported statement that ". . . The typewriter, the checks and the check protector listed in this application are located at the residence of Garrett Jack Ogden." This point has no merit whatever. The affidavit specifies that Detective Lux knew of his own knowledge of the burglary of Johnson Trucks; that checks had been taken in the burglary; that Belden was apprehended attempting to pass one of these checks and had told him where the checks, check protector and typewriter were located. The affidavit need not pinpoint every source of an affiant's belief, so long as it discloses a sufficient basis on which a finding of probable cause can be made. (*State v. Hart*, supra.) If the apparent facts set out in the affidavit for a search warrant are such that a reasonably discreet and prudent man would be led to believe that there was a commission of the offense charged, there is probable cause to justify the issuance of a search warrant. (*Dumbra v. United States*, 268 U. S. 435, 69 L. Ed. 1032, 45 S. Ct. 546.)

In *United States v. Long*, 449 F. 2d 288, the court held statements of an admitted bank robbery participant to an FBI agent, that on a given date one of the alleged bank robbers had in his possession on premises to be searched a black suitcase containing part of the money, established probable cause for a search of such premises, despite the contention that the admitted accomplice could not be classified as a credible person.

The appellant further argues the search warrant authorized the

search of "a white frame residence"—not a search of adjoining grounds, yet the envelope was taken from the trash can at the rear of the yard. *United States v. Long,* supra, also holds that the search of a trash barrel located just outside of the building described in the warrant was properly considered as a part of the "premises" to be searched. (See, also *Walker v. United States,* 225 F. 2d 447, and *Martin v. United States,* 155 F. 2d 503.)

Under no theory raised by the appellant was there an illegal search of the property involved and the trial court did not err in admitting the evidence seized.

The appellant next contends the witness Gary Belden should have been allowed to testify about the status of his parole or his knowledge of any crime investigation involving him; and that the witness Jerry Lee Owen should have been allowed to testify as to whether he had any personal interest in testifying against the appellant. The appellant argues Belden's testimony was very damaging to him, and counsel sought to impeach his testimony by eliciting testimony regarding his motivation for testifying; specifically, that if he did not testify favorably for the prosecution, (1) he feared prosecution from other charges, or (2) he feared that parole previously granted would be revoked. The court sustained the prosecution's objection to this line of questioning.

The record does not confirm the appellant's blatant charges. Owen answered directly when asked whether it was true that he did not expect the prosecutor's office to press prosecution against him. (Owen had not been tried when he testified.) Owen answered, "I don't know what they will do." When further cross-examination was attempted along the same line, the court sustained the state's objection on the ground that the witness had already stated his opinion.

Cross-examination of Belden to determine his motivation for testifying was limited in scope. Belden admitted talking to the prosecuting attorney at various times. He was then asked whether he was aware that his parole officer could revoke his parole with the approval of the court. He answered in the affirmative, and the prosecuting attorney's objection to the form of the question was sustained. The line of cross-examination was then changed, and Belden was asked whether the police questioned him about other checks that had not been mentioned in the course of his testimony. He answered, "No, sir, they haven't." The same question was then repeated and the court sustained the prosecution's objection.

Counsel for the appellant, out of the jury's hearing, then pressed the court for permission to pursue the possibility of parole revocation concerning Belden.—"Whether he fears that his parole might be revoked if he doesn't testify." The court ruled counsel was making an improper inference, that the regular standard form of conditions in a parole concerned only violation of any law. Counsel for the appellant did not press inquiry for impeachment purposes on cross-examination further.

Limitations on cross-examination are discretionary with the trial court, and the exercise of that discretion will be overturned only upon a showing of abuse which is clearly prejudicial. (*State v. Zeilinger*, 147 Kan. 707, 78 P. 2d 845; *State v. Stewart*, 179 Kan. 445, 296 P. 2d 1071; *State v. Mitchell*, 181 Kan. 193, 310 P. 2d 1063.)

It is not shown the trial court abused the exercise of its power of discretion in curtailing cross-examination on the record here presented.

The appellant contends Laws 1969, ch. 180 (K. S. A. 1971 Supp. 21-4504), should have been followed in sentencing him, thereby leaving it to the discretion of the trial court whether to apply the habitual criminal act, or, in the alternative, the county attorney was guilty of arbitrary and capricious conduct in applying that act to the appellant.

The sentencing occurred on July 1, 1970, the date on which the repeal of K. S. A. 21-107a became effective, and the date on which K. S. A. 1971 Supp. 21-4504 became effective.

K. S. A. 1971 Supp. 21-4504 (3) provides:

"Subsections (1) and (2) of this section shall be applicable only to those convicted criminals *initially sentenced* [for offenses committed] after the effective date of this act. In the event that any defendant has been convicted prior to the effective date of this act *and sentenced under K. S. A. 21-107a* and thereafter is for any reason returned to the court imposing the initial sentence, he shall be resentenced under the provisions of K. S. A. 21-107a as it existed prior to July 1, 1970." (*Emphasis supplied and words in brackets added.*)

A literal reading of the above section of the statute, without studying subsections 1 and 2, would indicate the appellant's point has merit. Subsections 1 and 2 clearly make reference to sentences for crimes committed under the new criminal code, which applies only to offenses committed after the effective date of the act. But further clarification is indicated by K. S. A. 1971 Supp. 21-3102, § (4) which provides:

"This code has no application to crimes committed prior to its effective date. A crime is committed prior to the effective date of the code if any of the essential elements of the crime as then defined occurred before that date. *Prosecutions for prior crimes shall be governed, prosecuted and punished under the laws existing at the time such crimes were committed.*" (Emphasis supplied.)

It is apparent, after careful study of the above sections of the statutes and references, that the trial court correctly sentenced the appellant under K. S. A. 21-107a, and it was discretionary with the prosecuting attorney to invoke it. The legislature might have clarified the section (21-4504 [3], *supra*) by inserting the words indicated in brackets. This section of the statute (K. S. A. 1971 Supp. 21-4504 [3]) should be and is construed as if the words in brackets had been inserted.

Finally, the appellant contends the trial court erred in not allowing him to appear personally at the hearing on his motion for probation from the confinement portion of the sentence.

The appellant had two prior felony convictions and he was referred to the Diagnostic Center for evaluation, examination and report within the statutory time. The trial court had a report on the appellant from the institution when probation was denied. The appellant cites no authority in point to support his assertion and we know of none. The appellant acknowledges the existing Kansas law is that a person convicted of crime and sentenced need not be present at his hearing for probation.

No reversible error having been shown, the judgment of the lower court is affirmed.