RICHARD L. HOLMES, Retired Appellate Judge.
In December 1994 Billy Marsh filed a petition in the probate court, requesting that the court find his wife, Joyce Marsh, to be mentally ill and commit her to the custody of the Department of Mental Health and Mental Retardation (Mental Health).
A probable cause hearing was held on January 4, 1995. Marsh and her guardian ad litem were present at this hearing. Marsh, her husband, and her treating psychiatrist testified at this hearing. The probate court treated the January 4, 1995, hearing as a final hearing and issued an order committing Marsh to the custody of Mental Health for treatment in a confined setting.
Marsh filed a post-judgment motion, requesting that the probate court rescind the order committing her to the custody of Mental Health, treat the January 4,1995, hearing as a probable cause hearing, and schedule a final hearing within 30 days. The post-judgment motion was granted.
After the final hearing on January 12, 1995, the probate court issued an order committing Marsh to the custody of Mental Health for treatment in a confined setting.
Marsh appeals.
The dispositive issue is whether the evidence presented at the two hearings was sufficient to support an order for involuntary commitment for inpatient treatment.
Ala.Code 1975, §§ 22-52-1.1 through -15, governs the procedure used to involuntarily commit mentally ill persons to facilities for treatment. Ala.Code 1975, § 22-52-10.1, provides that there must be clear and convincing evidence that the individual meets the criteria for involuntary commitment.
Ala.Code 1975, § 22-52-10.4, provides the four criteria which must be established by clear and convincing evidence in order for the court to involuntarily commit a person to a facility for inpatient treatment. One of these criteria is that “as a result of the mental illness the respondent poses a real and present threat of substantial harm to self and/or others.” Section 22-52-10.4(a)(ii).
On appeal, Marsh contends that there was not clear and convincing evidence that she posed a real and present threat of substantial harm to herself or to others.
Our review of the record reveals the following: Dr. Robert Hamilton, Marsh’s treating psychiatrist for the past six years, testified that Marsh suffered from schizoaffective disorder. Dr. Hamilton stated that Marsh’s prognosis would be good if she would take the prescribed medications. He explained that Marsh had always taken her prescribed medications until the latter part of the spring of 1994 when she began complaining of side effects from the medications and began refusing to take her medications.
Marsh was hospitalized during the summer of 1994 for treatment at Baptist Medical Center Montclair. After her release from the hospital, Marsh, once again, refused to take her medications, which ultimately resulted in her hospitalization at Baptist Medical Center Montclair on December 29, 1994.
Dr. Hamilton testified that on the day of her admission, Marsh was literally screaming *14 at the top of her lungs. He indicated that while there was some marginal improvement in her condition, she had not recovered enough to be able to go home without some long-term hospitalization. Dr. Hamilton stated that there was significant potential for Marsh to harm herself or others.
Dr. Hamilton explained that long-term hospitalization is necessary for Marsh because it will allow time for the medication to bring her psychotic symptoms into virtually a total remission and will aid her in gaining some insight into her need to comply with the prescribed treatment of medication.
Dr. Hamilton was questioned about whether some additional time for treatment at Baptist Medical Center Montclair would be beneficial to Marsh, rather than involuntarily committing her to Mental Health. Dr. Hamilton stated, “just the fact that we’re here today means that [the admission to Baptist Medical Center Montclair in the summer of 1994] failed.”
At the hearing Marsh stated that God has told her that she does not have a mental illness. Marsh also indicated that she will reject any psychiatric consultations and that she will not take any medications.
Marsh’s 14-year-old son testified that on the night before his mother’s admission to the hospital in December 1994, she came to him and asked if he needed to confess to doing anything illegal. Thereafter, she placed her hands around his neck in a threatening manner. The son stated that Marsh told him that she was going to put her fingers through his neck. Although he was able to push her away, he indicated that the incident was very unnerving. When questioned about the incident, Marsh testified that she put her hands around her son’s neck to get his attention.
Marsh’s son also testified that on the night before her admission to the hospital, his mother threatened to cut off his older brother’s penis because his brother had gone on a choir trip which she thought he should not have been allowed to attend.
In light of the above, we find that there was clear and convincing evidence to support the probate court’s order to commit Marsh to the custody of Mental Health.
The foregoing opinion was prepared by Retired Appellate Judge RICHARD L. HOLMES while serving on active duty status as a judge of this court under the provisions of § 12 — 18—10(e), Ala.Code 1975.
AFFIRMED.
All the Judges concur.